**CARLYLE TOWERS CONDOMINIUM ASSOCIATION, INC., et al., Plaintiffs,**

v.

**CROSSLAND SAVINGS, FSB, et al., Defendants.**

Civ. No. 95–6554.

United States District Court, D. New Jersey.

July 1, 1996.

Dennis A. Estis, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for Carlyle Towers Condominium Association, Inc., Vincent Rigolosi, Chryss Chryssanthou, Richard Linde and Marsha Squires, Plaintiffs.

Daniel P. Simpson, Hirsch, Newman & Simpson, Hackensack, NJ, for Anchorage Woods Construction Corp., Carlyle Associates of Cliffside Park, L.P., Carlyle Development Corp., William Achenbaum, Donald O. Stein, and David Bengel.

Michael D. Suarez, Suarez & Suarez, Jersey City, NJ, for Robert Rosenwasser Associates.

Douglas Fasciale, Hoagland, Longo, Moran, Dunst & Doukas, New Brunswick, NJ, for Brownsworth, Mosher & Doran Engineering Associates, P.C.

Philip N. Boggia, Durkin & Boggia, Ridgefield Park, NJ, for Boswell Engineering, Inc.

Mary Rose Migliazza, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Daurio & Russo & Sons Construction Co., Inc.

Richard D. McLaughlin, Hackensack, NJ, for J. Fletcher Creamer & Son, Inc.

M.J. Frank, Buttafuoco, Karpf & Arce, Kearny, NJ, for Tri State Sol–Aire Service Company.

Anthony Giampapa, Clifton, NJ, for Power Electric Co., Inc.

William F. Mueller, Clemente, Dickson & Mueller, Morristown, NJ, for Manners Associates, Inc.

Kathleen A. Walrod, Nelson & Walrod, Union City, NJ, for G.T. Window Installations Corp.

Judy L. Cavet, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Crossland Federal Savings Bank, Cross Cliff Corp., Carol Mann, John Brinster, Lawrence D. Truppo, George Kondos, Maureen Bauer, and Marc Chernin as Defendants.

Christopher J. Carey, Tompkins, McGuire & Wachenfeld, Newark, NJ, for Crossland Federal Savings Bank, as Third–Party Plaintiff.

Michael A. Haskel, Mantell & Haskel, New York City, for Crossland Federal Savings Bank, Pro Hac Vice Counsel.

Andrew S. Turkish, Shanley & Fisher, P.C., Morristown, NJ, for Northstar Fire Protection, Inc.

Wallace D. Madison, Pro Se.

Stuart James and Saliann Scarpulla, FDIC New York Legal Services Office, New York City, for FDIC, as Receiver for Crossland Savings, FSB, Third–Party Defendant.

Esther S. Widowski, Kessler & Widowski, New York City, for FDIC in its Corporate Capacity.

Edward P. D'Alessio, Loikith, D'Alessio & Kugelman, Fairfield, NJ, for Andrew Marshall, Jr., P.E. & L.S., P.A.

Stuart Reiser, Shapiro & Croland, Hackensack, NJ, for Hampshire Management Company, Third–Party Defendant/Fourth–Party Plaintiff.

James Demetrakis, Pro Se.

Robert P. Travers, Edgewater, NJ, for Oliver, McCartney & Holmes, Inc.

Francie E. Joseph, Parsippany, NJ, for St. Paul Fire & Marine Insurance Company.

CHESLER, United States Magistrate Judge.

## I. Introduction.

This matter comes before the Court on the motion of Defendants to disqualify Plaintiffs' counsel. This matter was referred to the undersigned by the Honorable Harold A. Ackerman, U.S.D.J. Oral argument was heard on June 24, 1996. For the reasons stated below, the motion is denied.

## II. Background.

This matter arises from the construction and sale of condominium units at Carlyle Towers Condominium. Current counsel for Plaintiff Carlyle Towers Condominium Association, Inc. ("Association" or "Carlyle"), is Greenbaum, Rowe, Smith, Ravin, Davis & Himmel ("Greenbaum Rowe"). This firm was approached in 1992 to represent an *ad hoc* group of the Carlyle Towers Condominium owners. Subsequently, the Association also retained Greenbaum Rowe.

Defendants claim that Greenbaum Rowe should be disqualified from representing the Association in this matter because of a perceived conflict with another client of Greenbaum Rowe. This other representation began in 1985, when Greenbaum Rowe was retained by Coronet Properties Company, L.P. ("Coronet"), regarding the conversion of apartments at Woodcliff Gardens to co-ops. Coronet's interests in these apartments were subsequently assigned to Woodman 8300 Corp. ("Woodman"), then a subsidiary of Manhattan Savings Bank ("Manhattan Savings"). In 1991, Greenbaum Rowe was specifically retained to continue to perform transactional work for both Woodman and Manhattan Savings regarding the Woodcliff Gardens apartments. The majority of the work involved preparing and filing Public Offering Statements ("POS's") and amendments to such statements.

Through a complex series of mergers and acquisitions over the years, both Woodman and Manhattan Savings have now become corporately related to CrossLand Federal Savings Bank ("CrossLand"), a defendant in the matter before this Court. Defendants allege that Greenbaum Rowe is prohibited under RPC 1.7 from suing CrossLand while representing its corporate relation, Woodman, and must, thus, be disqualified from representing Plaintiffs here. Defendants further allege that even if Woodman and Manhattan Savings are found to be former clients, Greenbaum Rowe is still disqualified under RPC 1.9, because of the substantial relationship between the Woodman condominium conversion matter and the matter now before this Court. The specific facts leading up to the current corporate relationships between the parties are as follows:

When Coronet assigned its interests in the Woodcliff Gardens apartments to Woodman in 1990, Woodman was, as noted above, a subsidiary of Manhattan Savings which was, in turn, a wholly owned subsidiary of Republic New York Corp. ("Republic Holding"), a bank holding company[1] that was also the sole owner of Republic National Bank of New York ("Republic National"). Manhattan Savings changed its name to Republic Bank for Savings ("Republic Savings") in 1993. Greenbaum Rowe thus represented both Woodman and Manhattan Savings, turned Republic Savings, regarding the Woodcliff Gardens apartments in transactional matters dealing with converting the apartments to co-ops and with selling those units. This was the state of affairs when Greenbaum Rowe filed suit for Carlyle, its client in this action, against the defendants, including CrossLand, in 1995. No conflicts of interests were present at that time.

On January 2, 1996, subsequent to the filing of this suit, Republic Savings, the par-

---

**1.** A bank holding company, for the purpose of this motion, is analogous to a parent corporation, with the bank being held analogous to that parent's subsidiary.

ent of Woodman, merged into Republic National. Thus, Woodman became a direct subsidiary of Republic National. The next month, February 1996, Republic Holding (Republic National's parent) acquired Brooklyn Bancorp, Inc. ("Brooklyn Bancorp"), the holding company for Defendant CrossLand. At that point, defendant CrossLand was merged into Republic National and Republic National succeeded to all of CrossLand's assets, rights and liabilities. In fact, on May 7, 1996, Plaintiffs amended their Complaint to substitute Republic National Bank in the place of Defendant, CrossLand.

The relationships can be diagramed as follows:

Thus, Greenbaum Rowe was, indeed, in the unenviable position of representing Woodman, a subsidiary of Republic National regarding one transactional matter, and of suing Republic National, standing in the shoes of CrossLand Federal, in this lawsuit.

On April 16, 1996, Gerald A. Liloia, attorney for Defendant CrossLand/Republic National, wrote a letter to Dennis A. Estis, attorney for Plaintiff at Greenbaum Rowe, indicating that because of Republic National's acquisition of CrossLand, and Greenbaum Rowe's concurrent representation of Woodman, "it appears that RPC 1.7 precludes [Greenbaum Rowe] from acting in a manner adverse to Republic." (Letter from Liloia to Estis of April 16, 1996 at 2, attached to Certification of Gerald Liloia [hereinafter Liloia Cert.] as Ex. A.) Furthermore, Mr. Liloia demanded that Greenbaum Rowe "cease activities that are adverse to [Republic], including withdrawal from representing the plaintiffs in the Carlyle Towers matter." (Id.)

Greenbaum Rowe handled this conflict by letter dated May 17, 1996, in which Mr. Kerry Brian Flowers of Greenbaum Rowe indicated to Mr. John S. Pancetti, Jr. of Woodman 8300 Corp, that "inasmuch as Republic has made it clear, through its counsel, that it deems a conflict to exist by virtue of the Bank's recent acquisition of Crossland Federal, our firm is obligated to advise you that we can no longer represent the interests of Woodman 8300 Corp. We ask that you arrange for alternative counsel to handle any matters involving Woodman 8300 Corp. in the future." (Letter from Flowers to Pancetti of May 17, 1996 at 1, attached to Certification of Kerry Brian Flowers [hereinafter "Flowers Cert."] as Ex. A, [hereinafter "Flowers Ltr."].) Greenbaum Rowe asserts that from the sending of this letter, Woodman was no longer its client. (Pl.Br. at 9.)

On May 24, 1996, Defendant CrossLand filed this motion requesting Greenbaum Rowe's disqualification as Plaintiffs' counsel.

### III. Discussion.

The Local Rules for the District of New Jersey provide that

[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law.

D.N.J. Gen.R. 6. Thus, to resolve questions of professional ethics, this Court turns to New Jersey's Rules of Professional Conduct. It is clear that the intention is for practition-

ers in both the state and federal courts in New Jersey to be governed by a single ethical code. Nevertheless, while efforts should be made to avoid inconsistent determinations under the RPCs, and this Court may certainly look for guidance to the decisions of the New Jersey state courts, our Local Rules do not require that this Court be bound by those decisions.[2]

This motion to disqualify Plaintiffs' counsel must be carefully scrutinized because "[m]otions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary." *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993) (*citing Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983)). "[D]isqualification motions are often made for tactical reasons, but . . . 'even when made in the best of faith, such [disqualification] motions inevitably cause delay' in the underlying proceedings." *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218, 536 A.2d 243, 252 (1988). Therefore, close judicial scrutiny of the facts of each case is "required to prevent unjust results." *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121, 1126 (N.D.Ohio 1990). *Accord, Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469, 416 A.2d 852, 857 (1980) (indicating that when dealing with ethical problems, "[t]he conclusion in a particular case can be reached only after 'painstaking analysis of the facts and precise application of precedent.'") "Disqualification questions are intensely fact-specific, and it is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts." *Gould*, 738 F.Supp. at 1124 (*citing Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 567 (S.D.N.Y.1987)).

Furthermore, these situations do not arise in a vacuum. "[T]he ethical rules should not be blindly applied without consideration of relative hardships." *Id.* When considering motions to disqualify, there will most likely be hardships for one client if their attorney is disqualified, as well as possible hardships for the other if their attorney is allowed to proceed against them. Thus, a delicate balance must be maintained between "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice." *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983). Besides weighing these factors, the court must also consider "the court's obligation to maintain high professional standards and to ensure that the trial of the claims in the case will be free from taint." *Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 567 (S.D.N.Y.1987). *See also, Steel v. General Motors Corp.*, 912 F.Supp. 724, 733 (D.N.J.1995) ("Resolution of a motion to disqualify requires the court to balance 'the need to maintain the highest standards of the [legal] profession' against 'a client's right to freely choose his counsel.'").

When pondering the proper outcome for a specific case, "[c]ourts must exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's respect; the opposite effect is just as likely—encouragement of vexatious tactics, which increase public cynicism about the administration of justice." *Gould*, 738 F.Supp. at 1126.

■ "Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified." *Alexander*, 822 F.Supp. at 1114.

*Application of RPC 1.7*

■ Defendant claims that "Greenbaum Rowe should be disqualified under RPC 1.7 because its representation of plaintiffs is directly adverse to a current client and creates an impermissible appearance of impropriety."

2. Common sense and practicality strongly suggest that both federal and state courts strive for consistent interpretations of these rules. Nevertheless, the language of General Rule 6 clearly indicates only that this court has adopted the RPC's "as revised by the New Jersey Supreme Court." Thus, the Court rejects the suggestion made by one commentator that this court may only reach its own conclusions as to appropriate interpretations of the RPC's "[w]here there is no definitive state court decision interpreting the rules as promulgated by the Supreme Court." Allyn Z. Lite, New Jersey Federal Practice Rules 35 (1996 ed.).

(Mem. of Law in Supp. of Mot. to Disqualify Pl. Counsel [hereinafter D.Mem.] at 6.) New Jersey's rule regarding conflicts between current clients states that

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:
>
> (1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and
>
> (2) each client consents after a full disclosure of the circumstances and consultation with the client. . . .

RPC 1.7(a).

"This rule arises out of the fundamental proposition that an attorney owes a duty of undivided loyalty to his or her client." *Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 F.Supp. 188, 192 (D.N.J.1989). Such loyalty is diluted by attempting to represent clients with adverse interests. Thus, Rule 1.7 prohibits such concurrent representations.

At the time Republic Holding acquired CrossLand's parent, Brooklyn Bancorp, both Woodman and Carlyle (the client with the interests adverse to Woodman's corporate relative) were current clients of Greenbaum Rowe. The party originally being sued in the case before this Court, however, is Cross-Land Federal.[3] Defendant CrossLand was never a client of Greenbaum Rowe. Nevertheless, there is sufficient case law which supports the proposition that, for conflict purposes, representation of a subsidiary corporation is equivalent to representation of its parent, and vice-versa, for this Court to assume, *arguendo,* that suing CrossLand is equivalent to suing Woodman. *See, Teradyne, Inc. v. Hewlett–Packard Co.*, 1991 WL 239940, at *6–7 (N.D.Cal. June 6, 1991) (finding that, for conflict purposes, the parent company was also the client of law firms which had represented a wholly owned subsidiary of Hewlett–Packard ("HP") and HP's Pension Plan and Profit Sharing Trust, respectively); *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 756 F.Supp. 789, 793 (S.D.N.Y. 1991) (finding a conflict where the law firm represented a subsidiary in one instance, and filed suit against the parent company in another); *Hartford Accident and Indemn. Co. v. RJR Nabisco, Inc.*, 721 F.Supp. 534, 540 (S.D.N.Y.1989) (finding that parent company, through it's subsidiary, was client of firm for conflict purposes, but denying motion to disqualify on fact-specific grounds).

Thus, at the time CrossLand was merged into Republic National, Greenbaum Rowe had a current-client conflict problem and RPC 1.7 applied.[4]

Some courts have found that

> [b]ecause the interest sought to be protected by Model Rule 1.7 is one of loyalty, a per se rule of disqualification should be applied when that rule is breached. Disqualification will not only protect the present client but will have the salutary effect of promoting public confidence in the integrity of the bar and the judicial system.

*Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 F.Supp. 188, 195–96 (D.N.J.1989). Other courts, however, have determined that disqualification is not always mandatory. *See, Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121, 1126–27 (N.D.Ohio 1990) (applying a balancing test to determine that where conflict was created during litigation, through no action of firm, disqualification was not required); *Hartford Accident*, 721 F.Supp. at 541–42 (finding disqualification too prejudicial to client and that disqualification would not further purposes of ethical rules); *Ex parte AmSouth Bank, N.A.*, 589 So.2d 715, 722 (Ala.1991) (applying common sense to a conflict situation not created by the law firm to determine that disqualification is not required). This Court is likewise

---

3. Although Republic National has succeeded to CrossLand's liabilities and has been substituted as a defendant in this matter, Plaintiff's dealings were entirely with an entity called "CrossLand Federal." Therefore, the defendant in question here will continue to be called "CrossLand" in this opinion for clarity's sake.

4. Greenbaum Rowe's argument that 1.7 does not apply because Greenbaum Rowe took steps to remove itself from representation of Woodman, so that only a successive client analyses needs to be done under 1.9, is invalid. This Court must still analyze whether the steps taken at the time of the current-client conflict were proper under RPC 1.7.

convinced that 1.7 does not mandate disqualification here.

The case relied on by Defendants, *Stratagem Development Corporation v. Heron International N.V.*, 756 F.Supp. 789 (S.D.N.Y. 1991), does not persuade otherwise. There, the court held that the law firm was per se ineligible to represent the plaintiff venturer in an action suing for breach of a joint venture agreement, as the firm had not clearly terminated its on-going representation of defendant's wholly owned subsidiary in connection with labor disputes. *Id.* at 793. Plaintiff Stratagem Development Corporation ("Stratagem"), was suing a joint-venturer, Heron Properties ("Heron"). The law firm had represented Strategem in all its dealings relating to this property development joint venture. Concurrently, the firm also represented a wholly-owned subsidiary of Heron Properties, Fidelity Services Corporation ("FSC"), regarding a labor dispute, which was unrelated to the firm's representation of Strategem.

At the point where suit by Strategem became inevitable against Heron, the firm wrote to an officer at Heron indicating the conflict and stating that they planned to resign as FSC's counsel. *Id.* at 791. Several letters were exchanged between the firm and this Heron officer, along with plans to substitute counsel, but no substitution form was filed before the firm brought suit against Heron. The court determined that "the Firm was still in FSC's employ when it investigated and was drafting the complaint against FSC's parent company." *Id.* at 793. For this reason, the court further determined that because the firm "had not clearly terminated its representation of FSC and fixed the parameters of its representation of FSC by the time preparations for the instant litigation were begun, [the firm was] per se ineligible to represent Strategem in this matter." *Id.* It is clear that disqualification in *Stratagem* was necessary to further the rule's purposes of protecting client confidentiality, maintaining integrity and preserving attorney loyalty to current clients.

*Stratagem* is clearly distinguishable from the case before this Court, however. There, the conflict existed even prior to the filing of the law suit. Here, the conflict was created, through no act of Greenbaum Rowe, while the litigation was ongoing. There, it is clear that, prior to the filing of the suit, the firm had dealings directly with the parent, Heron, now being sued, not merely with the subsidiary client, FSC. Here, CrossLand, the original defendant, is a stranger to Greenbaum Rowe, with no history of any sort of relationship, legal or otherwise, between the two. There, the firm had an existing duty of loyalty to Heron at the time the firm filed suit against it. Here, Greenbaum Rowe had no such prior duty to CrossLand when the suit was filed. There, it is unclear that the firm took proper steps to terminate its relationship with the subsidiary before commencing actions against the parent. Here, as soon as the conflict became evident, Greenbaum Rowe clearly withdrew as Woodman's counsel. For these reasons, *Stratagem* is not persuasive authority which commands Greenbaum Rowe's disqualification.

The reasoning of *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121 (N.D.Ohio 1990), however, is both applicable to this case and persuasive that disqualification is not mandated here. There, as in this case, the firm found itself representing a subsidiary corporation in one matter, while suing the subsidiary's parent in unrelated litigation, as a result of a merger which occurred after the initiation of the lawsuit. *Id.* at 1126. After careful consideration of the facts in that case, however, the court determined that disqualification was not mandatory, but that the firm did need to withdraw as counsel for one of the clients. *Id.* at 1127. The choice of which client to continue to represent was left to the law firm. *Id.* The underlying facts are as follows:

The law firm of Jones, Day, Reavis & Pogue ("Jones Day") represented plaintiff Gould, Inc. ("Gould"), in litigation against various defendants, including Pechiney and Trefimetaux ("Pechiney"), filed October 23, 1985. Jones Day also represented another client, IG Technologies, Inc. ("IGT"), in various matters related to contracts and licensing, and wholly unrelated to the Gould/Pechiney litigation. In July, 1989, Pechiney

acquired IGT, which became its subsidiary. Jones Day made no effort to resolve the resulting conflict. *Id.* at 1123. Pechiney moved to have Jones Day disqualified from representing plaintiff Gould, claiming that the ethical rules were violated by Jones Day's representation of Gould in a suit against Pechiney, while Jones Day also represented Pechiney's subsidiary, IGT. The court denied the motion to disqualify Jones Day and indicated that

> [t]he explosion of merger activity by corporations during the past fifteen years, and the corresponding increase in the possibility that attorney conflicts of interest may arise unexpectedly, make it appropriate for a court to adopt a perspective about the disqualification of counsel in ongoing litigation that conforms to the problem. This means taking a less mechanical approach to the problem, balancing the various interests. The result is that the courts are less likely to order disqualification and more likely to use other, more tailored measures to protect the interests of the public and the parties.

*Id.* at 1126.

To determine whether disqualification was mandated there, the court considered the following factors: whether there was any prejudice to Pechiney as a result of Jones Day's representation of Gould; whether any confidential Pechiney information has passed to Gould as a result of Jones, Day's representation of IGT; the cost to Gould to retain new counsel, in terms of both time and money; the delay to the litigation of requiring Gould to obtain new counsel; the complexity of the issues in the case and the time it would take new counsel to acquaint themselves with the facts and issues; and the fact that the conflict was created by Pechiney's acquisition of IGT several years after the instant case was commenced, not by any affirmative act of Jones Day. *Id.* at 1126–27. In support of its decision to deny the motion to disqualify, the court determined that there had been no showing of prejudice; no indication of the passage of confidential information; great cost to plaintiff to obtain new counsel; delay to the litigation to have plaintiff obtain new counsel; and very complex issues involved. *Id.* Furthermore, the court there stated that "[i]n short, the integrity of the judicial process in this case has not been threatened by the conflict." *Id.* at 1127.

For these reasons, the court found that disqualification was not required, but that, because a conflict did exist under the rules, Jones Day could not continue to represent both clients. *Id.* The court gave Jones Day the choice of which client to continue to represent, well "aware of holdings in other cases to the effect that courts should not permit attorneys to avoid disqualification simply by dropping one client for another." *Id.* The court expressed concern for situations where "a law firm discards a less profitable relationship in contemplation of taking on a more profitable, conflicting representation," *id.,* indicating that, in such situations, law firms would not be permitted to abandon the less profitable client when a potentially more lucrative client appears. *Id.*

The court did not feel that such was the situation in *Gould,* however.

> [Th]ere, Jones, Day did not create the IGT conflict. Rather, the conflict was created by an acquisition of the client for legitimate business reasons. . . . The court fails to see how the rules of ethics will be furthered by forcing Jones, Day to withdraw as counsel for Gould, or why the rules will not be served as well by giving Jones, Day a chance to choose how to extricate itself from a conflict it did not create, but to which it was unethically slow in responding.

*Id.*[5]

The situation now before this court is practically identical with the situation faced in *Gould*—except that Greenbaum Rowe, unlike Jones Day, was not unethically slow in responding. Both cases involve defense mo-

---

**5.** Because Jones Day failed to take any action to resolve the conflict itself, and because the court did find a violation of the ethical rules, the court, *sua sponte,* notified disciplinary counsel to the Supreme Court of Ohio, indicating that the ethical breach found "should be addressed by an agency charged with enforcing the ethical standards for lawyers in Ohio." *Gould,* 738 F.Supp. at 1127.

tions to disqualify plaintiff's counsel. In both cases, plaintiff's counsel also represented, in transactional matters, a subsidiary of the party being sued. In both cases, the defendant-parent moved for disqualification on account of the representation of its subsidiary. In both cases, the conflict arose after the filing of the suit, and the conflict was caused by the movant's acquisition of another business. Moreover, the fact that Greenbaum Rowe did not delay in attempting to cure the conflict weighs in favor of following the *Gould* logic. Upon learning of the conflict,[6] Greenbaum Rowe took immediate steps to disassociate itself from one of the clients in the conflict. As noted previously, by letter, Greenbaum Rowe plainly requested that Mr. Pancetti "arrange for alternative counsel to handle any matters involving Woodman 8300 Corp. in the future." (Flowers Ltr. at 1.) The firm also clearly advised Mr. Pancetti that Greenbaum Rowe "can no longer represent the interests of Woodman 8300 Corp." (*Id.*)

In applying the *Gould* factors to this case, I find that:

1. there is no prejudice to Republic as a result of Greenbaum Rowe's representation of Carlyle. Although Republic is now the party in interest, the alleged wrongdoing was done by CrossLand;

2. during its transactional work for Woodman in preparing Public Offering Statements Greenbaum Rowe could not have obtained any confidential CrossLand information which is relevant to the current suit;

3. during its transactional work for Woodman in preparing Public Offering Statements Greenbaum Rowe could not have obtained any confidential information regarding Republic's litigation strategy which would prejudice Republic in defending the current suit;

4. Greenbaum Rowe has represented Plaintiffs for four years, is intimately familiar with the facts and issues, and has established relationships of trust and confidence with the Plaintiffs;

5. Plaintiffs have an interest in maintaining their counsel of choice, in whom they have already invested, per Plaintiffs' counsel at oral argument, $300,000.00 in legal fees;

6. the cost to Plaintiffs to retain new counsel, in terms of both time and money, would be great;

7. this litigation would be delayed by requiring Plaintiffs to obtain new counsel;

8. the issues in the case are somewhat complex and it would take some time for new counsel to acquaint themselves with the facts and issues here;

9. the conflict was created by Republic National's acquisition of CrossLand sometime after the instant case was commenced, not by any affirmative act of Greenbaum Rowe.

Based on these factors I find that, although a conflict was created by Republic's acquisition of CrossLand, and that a Rule 1.7 situation arose, disqualification of Plaintiffs' counsel is not mandatory. Greenbaum Rowe could not, however, continue to represent Carlyle and Woodman concurrently. It was Greenbaum Rowe's choice, at the time the conflict arose, to determine which client to continue to represent. It was proper for Greenbaum Rowe to choose to represent Carlyle and to inform Woodman of their inability to continue that representation.[7] Greenbaum Rowe's letter to Woodman was a proper way to withdraw.

Having thus determined that Rule 1.7 was not violated, the next question to address is whether Greenbaum Rowe must nevertheless be disqualified from representing Plaintiffs here because of a violation of RPC 1.9.

---

6. Although Defendant has submitted evidence of newspaper accounts of the merger which pre-date CrossLand's counsel's letter to Greenbaum-Rowe, it has failed to convince this Court that Plaintiff had any obligation to continually appraise itself of corporate mergers on the chance that a conflict might be created between two of its clients. Moreover, there is no evidence that Greenbaum Rowe had actual knowledge of the conflict prior to its receipt of Mr. Liloia's letter.

7. Another reason why it is proper for plaintiff's counsel to choose their client, in a situation where the defendant moving for disqualification created the conflict in the first place, is that this result discourages the possibility discussed in *Gould* where one party in a case creates a conflict "by buying up companies which opposing counsel represent[s]," *Gould*, 738 F.Supp. at 1127, to "force the disqualification or withdrawal of opposing counsel." *Id.*

## Application of RPC 1.9

■ RPC 1.9 states that

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client.

RPC 1.9(a).

Rule 1.9 serves several purposes.

It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar.... Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

*In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984), *cert. denied, sub nom Cochrane & Bresnahan v. Plaintiff Class Reps.,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Thus, the rule's purposes are to protect confidences, maintain integrity and preserve attorney loyalty. *Kaselaan & D'Angelo Assocs. Inc. v. D'Angelo,* 144 F.R.D. 235, 239 (D.N.J.1992).

■ Defendants here further contend that "[e]ven if these facts are analyzed under the former-client rubric of RPC 1.9, Greenbaum Rowe should be disqualified because its representation of plaintiffs is substantially related to the prior representation." (D.Mem. at 17.) Defendants assert that "the commonality of legal issues establishes the substantial relationship between Greenbaum Rowe's representation in the Woodcliff Gardens matter and its adversity to Republic National in the Carlyle Towers matter." (*Id.* at 20.) Determining whether or not disqualification is mandated under RPC 1.9 thus depends on whether, indeed, the two matters are substantially related.

The phrase "substantially related" has been interpreted by some courts to require a relationship between the factual issues of the case. *See, e.g., Ciba–Geigy Corp. v. Alza Corp.,* 795 F.Supp. 711, 716 (D.N.J.1992) (finding factual differences between the litigations in question which precluded disqualification); *Richards v. Badaracco,* 1988 WL 147152, at *3 (D.N.J. June 27, 1988) ("the test focuses on the similarity of the factual bases of the two representations"). Other courts have examined the identity of the legal issues involved. *See, e.g., Steel v. General Motors Corp.,* 912 F.Supp. 724, 735 (D.N.J.1995) ("Disqualification is mandated where 'the issues between the former and present suits are practically the same or where there is a 'patently clear' relationship between them.' "); *Kaselaan & D'Angelo Assoc. v. D'Angelo,* 144 F.R.D. 235, 240 (D.N.J. 1992) (same); *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 472, 416 A.2d 852, 859 (1980) (same).

Defendant concedes that the factual basis of the two representations is distinct, and argues, as noted above, that the identity of legal issues requires disqualification. Plaintiff urges that a lack of factual relationship is sufficient to find no violation of RPC 1.9. I need not choose between these two formulations, however, because the overarching concern of these courts has been to protect client confidences.

The "substantial relationship" test adopted by the *Reardon* court, and followed in *Kaselaan & D'Angelo,* as well as in other cases, indicates that "a substantial relationship between matters will exist where the 'adversity between the interests of the attorney's former and present clients ... has created a climate for disclosure of relevant confidential information." *Reardon,* 83 N.J. at 472, 416 A.2d at 859. *See, Kaselaan & D'Angelo,* 144 F.R.D. at 239 (*citing Reardon* ); *Richards,* 1988 WL 147152 at *3 ("The test for a 'substantially related matter' is whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation.").

In discussing a prior New Jersey case, the *Kaselaan & D'Angelo* court noted that hav-

ing confidential information there meant having had access to the prior client's "claims and litigation philosophy, its methods and procedures for defending claims and litigation, and its information regarding the administration of various business operations," *Kaselaan & D'Angelo*, 144 F.R.D. at 241 (discussing *Gray v. Commercial Union Ins. Co.*, 191 N.J.Super. 590, 468 A.2d 721 (App. Div.1983)). That court further indicated that in *Gray*, "plaintiff's attorney could use such information to the substantial disadvantage of his former client Commercial Union." *Id.*

Thus, in turning my attention to the matter before me, the question with which I must concern myself is whether Greenbaum Rowe could have acquired any information during its representation of Woodman which is relevant to Carlyle's suit against Cross-Land, and which could be used against Woodman or Republic National in the current litigation, which would thus put Woodman's and Republic's client confidences in jeopardy. If such is the case, the matters are substantially related and disqualification is mandated. I find, however, that no such situation exists. The Woodman matter and the Carlyle litigation are not substantially related. Disqualification of Greenbaum Rowe is not required here.

The work done by Greenbaum Rowe for Woodman was purely transactional in nature. According to defendants,

> Greenbaum Rowe prepared a "First Amended and Restated Public Offering Statement" ("POS") which became effective on July 3, 1991 and thereby permitted Woodman to offer and sell the units to the public. Since then, Greenbaum Rowe has also prepared and filed nine amendments to the POS. The most recent, the ninth amendment, has an effective date of October 18, 1995.
>
> In addition to its work in connection with amending the POS, Greenbaum Rowe has provided advice and counsel concerning the potential liability of Woodman as a successor sponsor of the co-op and its president's potential liability as a member of the Woodcliff Garden's Board of Directors. These matters were discussed in telephone conversations and set forth in an opinion letter from Greenbaum Rowe dated April 13, 1995.

(D.Mem. at 3–4 (internal citations omitted).) Therefore, Greenbaum Rowe acquired information regarding the Woodman POS and regarding Woodman's concerns about liability relating to the Woodcliff Garden's POS. Because Greenbaum Rowe only provided transactional assistance, however, it would have acquired no insight into Woodman's (or Republic National's) litigation philosophy or methods and procedures for conducting litigation defense. Certainly, client confidences would be involved in the representation, but such confidences are not jeopardized by Greenbaum Rowe's representation of Carlyle here.

The information Greenbaum Rowe acquired regarding the Woodman POS is clearly totally unrelated and irrelevant to the Carlyle/CrossLand POS. No client confidences obtained from drafting the Woodman POS would have any relevance to the Carlyle suit. The parties are different. The properties are different.

Furthermore, both parties having conceded at oral argument that all POS's are basically the same, any identity of issues regarding concerns about drafting public offering statements which protect the seller's liability, stems from the fact that most sellers would have similar concerns. The mere fact that Woodman, in drafting the Woodcliff Garden's POS and CrossLand, in drafting the Carlyle POS, would both have concerned themselves with seller liability, does not make the matters "substantially related" for conflict purposes. No confidential information is in jeopardy. Greenbaum Rowe never had any connection with the CrossLand attorney's who drafted the POS at issue here and never had any insight into CrossLand's concerns, litigation strategy, or other confidential client information which could now be used against it here. Therefore, Greenbaum Rowe acquired no insights into Republic's litigation strategy which would give its current client, Carlyle, an advantage in a suit against Republic.

Moreover, the fact that Greenbaum Rowe might take inconsistent positions in both representations, for example having previously

advised about the suitability of a particular clause in the Woodman POS, and now arguing that a similar clause in the CrossLand POS is ineffective to shield liability, does not make this matter "substantially related." Nothing before this Court convinces me that an attorney may not take inconsistent positions in different situations if that is what is needed to serve the interests of the client.

Therefore, I find that these matters are not substantially related and that disqualification of Greenbaum Rowe is not required under RPC 1.9(a)(1).[8]

Furthermore, no "appearance of impropriety" exists in violation of RPC 1.9(b). RPC 1.9(b) incorporates the "appearance of impropriety" prohibition of RPC 1.7 into successive representation problems under 1.9. For all the reasons discussed previously, no such appearance of impropriety is present here. Under the 1.7(c)(2) appearance of impropriety standard, no "ordinary knowledgeable citizen acquainted with the facts [of the matter now before this Court] would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." RPC 1.7(c)(2).

### IV. Conclusion.

For the reasons discussed above, Defendants' motion to disqualify Greenbaum Rowe as Plaintiffs' counsel is denied. An appropriate Order shall issue.

### ORDER

This matter comes before the Court on the motion of Defendants to disqualify Plaintiffs' counsel. This matter was referred to the undersigned by the Honorable Harold A. Ackerman, U.S.D.J. Oral argument was heard on June 24, 1996.

The Court having reviewed the papers submitted by the parties; having heard oral argument; and for all of the reasons set forth in this Court's Opinion issued on this same date; and for good cause shown;

IT IS hereby

ORDERED that Defendants' motion to disqualify Greenbaum Rowe as Plaintiffs' counsel be and hereby is DENIED.

---

8. Because, as noted previously, no client confidences or information relating to the Woodman representation would be relevant to the Carlyle matter, there is no danger of such being disclosed here. Thus, RPC 1.9(a)(2) is not implicated.